Foran, J.
Tbis is an action by Louis Park and 22 other Chinamen who claim to be the owners and proprietors of a restaurant located at 304 Superior avenue, in the city of Cleveland, Ohio, and known as the Peacock Inn, against Locals Nos. 10|6, 107, 108 and 167 of the Hotel and Restaurant Employees International Alliance, and others sued with them, as the caption indicates. Twelve of the plaintiffs claim that they are natural born citizens of the United States and state of Ohio, and the others are natives of China but claim that by treaty stipulations between China and the United States they have a right to maintain this action.
Their claim is that the defendant trades unions are labor organizations and consist of a large number of persons whose names and residences are unknown, and that all the defendants are engaged as conspirators in a common unlawful conspiracy and boycott against the- plaintiffs.
*260 In brief, the claini of the plaintiffs is that they are conducting a Chinese restaurant, and that all of the plaintiffs are partners, are joint owners and are jointly interested in the Peacock Inn; that they employ no waiters except the members of the copartnership, who are named herein as plaintiffs; that prior to the opening of said Peacock Inn, defendants demanded that no person be permitted by the plaintiffs to wait on patrons of said restaurant or to render service as waiters therein except persons who are members of the labor unions or organization to which the defendants belong; that they refused to accede to this request, and that thereupon the defendants inaugurated a boycott against the said restaurant and placed pickets in front of the door leading thereto, the restaurant being located upon the second floor of the 'building, and that the pickets of defendants continuously, especially during the times that meals are being served, walk up and down in front of said door leading to said restaurant, unlawfully blocking the entrance thereto and calling upon patrons and others who are passing by said door, that no patriotic citizen should patronize said restaurant because it is unfair to union labor; that the defendants, through said pickets and otherwise, have wilfully, maliciously and falsely represented to the public and to the patrons and others of the plaintiffs, that the plaintiffs are unfair to union labor ■and have refused to employ returning soldiers of the United States, or, in other words, that they have instituted an illegal and unlawful boycott against plaintiffs and are threatening to do the plaintiffs irreparable injury; that they have no adequate remedy at law; and further, that the defendants refused to admit the plaintiffs to their union; that the plaintiffs never had any contractual or other trade relation with the defendants or any of them; that there is no trade dispute between the plaintiffs and defendants; that all of the plaintiffs are willing to work in said restaurant and that none of them have gone on strike or are engaged in a strike, and that the defendants are passing out cards to the public and especially to persons who are desirious of visiting and patronizing said restaurant, and that the following is a copy of said card:
*261 300 STARS On Our Service Flag.
Our Boys Are Coming Home,
THEY NEED WORK!
Don’t Patronize The Peacock Inn
The Golden Pheasant
They Refuse to Employ Them.
They Are Unfair to Organized Labor.
Endorsed by the Local Joint Board of the
Cleveland Fed. of Labor H. & R. E. I. A.
and B. I. L. of A.
(Union Label.)
This card is printed in three colors, the top being red, the center white, and the lower portion blue.
And further, in an amendment to the petition, plaintiffs claim that the defendants have continuously, since the opening of the Peacock Inn, maliciously and for the purpose of destroying the business of the plaintiffs, threatened, intimidated and coerced prospective patrons of the plaintiffs and the public generally, for the purpose of causing them to refrain from patronizing the plaintiffs’ restaurant, and to discriminate against the plaintiffs in the operation of their restaurant, on the ground that they are Chinamen and members of the yellow race, and that Americans should not patronize a Chinese restaurant, but should confine their patronage and support to restaurants operated by Americans or by white persons.
To this petition the defendants have filed a joint answer, in which, after certain admissions, they deny all the allegations in the petition and the amendment to the petition, for the reason that said statements are untrue or that the same are beyond the knowledge of these answering defendants. They further say that the Peacock Inn restaurant is a partnership operated under a fictitious name, and that the defendants have not complied with the laws of the State of Ohio with reference to partnerships. Further, they aver that the defendants belong to a voluntary organization and are not proper parties to the action. Further, they aver that Local Unions 106, 107, 108 and 167 are voluntary organizations, are not proper par *262 ties to said action and should be dismissed therefrom; that the defendants are members of a labor union, the purpose of which is to
“lift the mental, moral and social condition of the waiters of Cleveland or vicinity in an endeavor to obtain proper conditions-for their labor, better hours and better wages, and at the same ■ time insure to their employers more perfect work and faithful service, and the establishment of general confidence between employers and employees.”
The defendants further aver that the plaintiffs employ persons of Chinese extraction as waiters and cooks and that said persons are in competition with the members of the local unions represented -by the defendants, and that said competition is unfair, in that the employees of the Peacock Inn work a number of hours per week which are unhealthful and tend to promote bodily disease and bodily weakness; that because of the ability or willingness of the Chinese employed by the plaintiffs to work under such conditions, the employees of the plaintiffs have entered into unfair competition with American workmen in the same line of business, and that if this competition continues, the defendants and the members of the local unions to which they belong will be unable to maintain their standard of living, but will be forced out of employment; that in order to protect themselves and overcome this unfair competition, the defendants aver that it is necessary and desirable that the public of the City of Cleveland and elsewhere should be informed of the unfair competition which these defendants and their associates are required to meet; that they have a just controversy and dispute with the- plaintiffs and their employees concerning conditions and terms of employment, which they have a right to settle on fair conditions, and for that purpose they believe they have a right to inform the public of the conditions under which their Chinese competitors live and work; and further, that they fear, and have good reason to fear, that if the Chinese competition which is offered by the plaintiffs can not be met by the defendants and other American workmen engaged as waiters, *263 the members of the various labor unions affiliated with the defendant unions will be forced out of employment as waiters.
Defendants further aver that there is no malice, ill-will or hatred in their motives in doing what they are doing, but that they are engaged in a struggle for existence against unfair competition. Defendants admit they maintain pickets in front of said Peacock Inn, but deny that these' pickets are acting contrary to law or are doing anything which they are not justified in doing under the laws of the United States.
The pleadings are quite lengthy and the summary given is but a bare outline of their contents. The facts as developed by the evidence show that the plaintiffs are Chinamen, either born in the United States of in China, that they are owners and proprietors of this Peacock Inn as partners, and are engaged in conducting and carrying on a restaurant business and catering to the public generally; that the defendants never had any of their members or any of the members of their unions employed in this restaurant; that there never was a strike in the restaurant by any of the employees thereof, and that the sole purpose of the defendants is to compel the plaintiffs to employ union waiters or drive the plaintiffs out of business.
The court has serious doubts from the testimony whether the defendants really desire to become waiters in this restaurant, and seriously doubts the good faith of defendants in carrying on and conducting the boycott which it is admitted is being carried on and conducted against the Peacock Inn. The local unions named as defendants are constituent members of what is called the Hotel and Restaurant Employees International Alliance and Bartenders International League of America. The use of the word “International,” however, appears to be unjustifiable, because by Section 15 of the constitution of this organization, it is provided that no persons can become members who are not citizens by birth or naturalization, except it is provided that an applicant who has declared his intention of becoming a citizen may become a member, but must perfect his naturalization as soon as he is entitled thereto, and that failure to perfect citizenship, is subject to cancellation of *264 membership; and it is provided in the constitution that colored men may form local unions, but may not belong to the unions consisting of white men. In other words, while the colored brother may belong to the same church, he is not permitted to worship in the same pew. It is admitted that Chinamen can not belong to any local of defendants’ international union, and it will be- therefore seen that the efforts of the defendants, as disclosed by the evidence, are not for the purpose of unionizing the Peacock Inn, but for the ostensible purpose of compelling the management to discharge Chinese waiters and employ white waiters, and in default of so doing, compel the restaurant to cease doing -business.
It may be doubtful whether all of the plaintiffs are partners, their claim being that each has put into the common fund from $500 to $2,500. They have made affidavit to this effect, and there are no counter-affidavits filed by the defendants denying this fact. An effort was made to show that they were not partners, for the reason that many of them at the time the restaurant was organized had no money in bank or on deposit in any bank; but the court is unable to say or to hold that the claim of the plaintiffs that they are partners is untrue. It is matter of common observation that foreigners generally do not deposit their funds or money or surplus money in banks. Frequent references in the press to the loss of money by foreigners who keep their funds about them or in their homes, by loss, thefts and otherwise, is well known. If the plaintiffs are in fact partners, it is indeed difficult to see or understand how a boycott including the public -can be legally maintained against them. Under modern social conditions, the law of competition in business controls business relations as immutably as the law of gravitation controls matter. If a Chinaman can furnish better food at less cost than a white man, he will be patronized, and I know of no law that will compel or force any patron to pay a higher price for inferior food merely because it is prepared and served by a white man. While I may have some doubts or may have a suspicion as to the fact that the plaintiffs are all partners, yet the evidence seems to indicate that *265 they are, and if this is true, there is no principle of law that has come under my observation that will permit a combination of men to request the public to boycott a, store, restaurant or factory merely because it has a number of partners, all of whom are engaged as workers in the business.
During the argument, much was said about "the dignity and the rights of labor, with all of which the court is in hearty accord. Labor may be said to be the effort of human beings voluntarily exerted to attain a desired object or purpose. Labor does not and can not create matter, but by transmutation, transportation and transformation it changes the place and shape of matter from one manifestation or form into another. It is the most essential element of production, for without it there can be no production, and hence labor is essentially necessary to the progress, stability and well-being of society. A fundamental law of labor is that it follows the line of least resistance, for man has ever sought and ever will seek to attain with the minimum of exertion the maximum of results. It is universally admitted that two men-working together in certain lines of effort can produce a great deal more than both working separately, and therefore the efficiency of labor is vastly increased by combining the efforts of a great number of men, as well as by labor-saving devices and natural agents, such as water, steam and electric power. That labor is a burden is an indisputable fact, if performed for the sole purpose of obtaining a livelihood, without regard to its ethical significance. When a man enjoys his work and derives pleasure from the shape, form and beauty of the thing he is creating, the exertion ceases to be labor. A beautiful house exists in the mind of the architect or carpenter before he draws his plans or raises a hammer or grasps a saw, and as the carpenter proceeds to build for the love of creating, the exertion becomes pleasurable and not laborious. It therefore must be true that the physical effects of labor on a human being can be and are vastly diminished by the intellectual development and moral elevation of the laborer. The labor union that ignores this fact and devotes all its energies, through combination, to the *266 development of material, coercive force and power to accomplish. results however desirable, misses the vital principle of organization. If mind is the supreme law of human destiny, then to organized mind must be traced the progressive development of the human race. If labor is to progressively improve social conditions and attain higher idealities and grander realizations of human perfection, it must not forget that the organization of mind is an absolutely essential requisite to that end. To the man who takes no interest in his work except in so far as it furnishes him the means of subsistence, be he a professional, agricultural or industrial worker, the day seems interminably long and labor an intolerable, slavish burden. Such men become clock watchers, never progress, never rise into the realm of achievement, and eventually become scrap heap failures on the great highway of civilization, talking loudly of the rights of labor, whose blessings, benefits and beauties they ignore and neglect. The legal right of labor to organize, combine and strike against unjust conditions of employment is so universally recognized that the argument of counsel upon that phase of the controversy was wholly gratuitious, at least superfluous and unnecessary. The right is fundamental, for property and capital owe their existence not merely to the intelligence and effort of those who control them, but almost wholly to the labor of men in co-operation with the influence, power and forces of society. Property and capital are, in great measure, a social and collective, rather than an individual or personal fact. The greatest genius for industrial organization that ever lived could not create capital in a desert or wilderness where labor and society were unknown; hence labor and society, being largely, almost wholly the creators of wealth and capital, separate and apart from its owners, have a qualified and moral interest in it, and the right to protect those who create it and guarantee to them an equitable share of the results of their labor.
For generations the Congress of the United States, through protective legislation, has guaranteed to capital a miriimum of profit. If the theory or doctrine is sound, no man can justly *267 say that labor should not be guaranteed a minimum wage. As the law protects the genius of the inventor and the author, it can not consistently withhold from the worker the right to protect himself by all peaceful and lawful means, if society neglects or refuses to perform the full measure of its duty in this respect.
Again, a workman may have a direct implied contractual interest in the business of the man employing him; he may have moved with his family from a far distant state to the place where he is rendering service, at the invitation of the employer, and built a home adjacent to his 'factory. He has with the employer an implied contract of employment so long as he renders efficient service and conforms to the rules of the establishment. While in a certain sense this contract may be terminated at the will of either party, yet by common usage, based upon reason and sound public policy, the employer may not exercise his right to terminate the contract capriciously, arbitrarily or from motives purely sinister. For instance, in many railroads, efficient, sober and courteous employees are never discharged, and when incapacitated by age or infirmity, are retired upon a pension graduated by length of service and rate of wage. The fact that they have an interest in the property they helped to create is recognized by some corporations, even though society has failed to perform an obvious duty.
The right of the expectation of continuous employment during efficient and good behavior is no longer a claim based upon charity or the grace or pleasure of the employer, but a right based upon justice and the welfare of society. This right, however, exists independently of labor unions; it is the right of all workmen, whether organized or not. Organized workmen believe, and may be justified in the belief, that the condition of labor is advanced and improved by unionization, but they have no right, by coercive force and intimidation, to thrust their views upon those who honestly differ with them. If this claim of the unionists is admitted, then free will and liberty of thought and action are destroyed. No man will claim that the members of one political party may, by force and coercion and in *268 timidation, compel the members of another political party to vote their ticket; nor will it be contended that the members of one religious denomination may coerce and force all others to unite with them and believe as they do, even upon the theory that the force and intimidation are applied for the sole purpose of saving the immortal souls of the unbelievers.
The right of legitimate and lawful propaganda is of course recognized. Propaganda in support of a principle based upon truth and honesty is a moral force of tremendous effect, far more potent in its consequences than coercion and intimidation. It is an appeal to reason and not an invasion of rights a man may honestly believe he is justified in preserving by all proper means in his power. Every creed, whether religious, social, industrial or political, must be judged and measured by the character of men and women it produces. If the tendency of unionism is to produce better citizens and more efficient, competent workmen, men who regard labor as “its own end,” ethically considered, then unionism will succeed and prevail, no matter what forces or combinations may be arrayed against it; but if it seeks to destroy initiative, incentive and individualism, and reduce all its members to the dead level of mediocrity, it will fail ignominiously.
The individual man can not develop or progress to a higher plane in a 'barren waste or in a wilderness; he can only develop to higher idealities in the social state. He brings to society only his labor and his undeveloped faculties. All that he ultimately becomes, he owes to society. If man would be happy, he must remember that labor is a duty as well as a right: To take labor out of the world, to forget that all progress is the result of overcoming difficulties, would place man back in the mists and shadows from which he emerged in prehistoric times. It may perhaps be impossible to wholly eliminate poverty, suffering and misery — they exist in the best governed states, and always will, as it is impossible to give to every human being the same ambition, desire and initiative. The effects of heredity, prenatal and congenital conditions can not be foreseen, nor wholly remedied by environment. It is vain to dream of an *269 Utopian age of effortless affluence and ease. That evils existing in society can be minimized by the steady progress of the race toward higher conditions is incontestable, and it should be our aim to aid this progress to the extent which experience and wisdom will permit. At present there are two classes: Those who have, and those who have not. If those who have not were to appropriate all the wealth of those who have, in a very limited period the two classes would again appear, for the wasteful and improvident would lose to those who cultivate habits of thrift and economy, or to those of natural or acquired selfish, shrewd, unscrupulous propensities.
Labor creates property, which in turn produces and multiplies itself. Savings come from wages and property in the open market is ever at the beck and call of savings. Some men dream of an ideal state which will “take charge of man from the cradle to the grave, caring on the way for all his necessities, from education to wages, opening in a word to all human beings according to age, the cradle, the asylum, the school, the workshop and the hospital.” In this ideal state, ambition, initiative and incentive are destroyed and man becomes a mere automaton, and the very law of existence, which is the law of labor, has no longer any appeal.
It is the duty of society to improve and lift the condition and status of all its members, and in proportion as it does this, it strengthens and stabilizes the state, but when a few men seek to usurp this collective duty of the state as their individual right, a conflict of authority necessarily arises which tends to the worst possible species of tyranny, the tyranny of an irresponsible minority, destructive of representative government.
It is to be regretted that society has so far evolved no more efficient or logical mode of settling labor and trade disputes than that archaic, clumsy expedient and disruptive force known as the strike. It would seem that legislation not destructive of individualism or bordering on state socialism could be devised that would bring about a just and equitable distribution of the wealth created by labor and capital. It would further seem that politicians are controlled by capitalists and -that labor, organized *270 and unorganized, is still shackled and dominated by political bias and prejudice. In a government like ours, where universal suffrage prevails, or soon will, all wrongs and grievances can be redressed by the vox populi, operating through society, whose highest duty is to give value to the individual without resorting to forces which lead to anarchy and chaos.' The workérs have a peaceful legal remedy provided by the Constitution and laws of the land, which, for some reason, they seem unable or reluctant to use and apply. The primary object of society being to give value to the individual, the state not only has the right, but it is its duty, by appropriate legislation, to provide for- an honest and equitable distribution of that which is produced by the combined efforts of labor and capital. The power of the state in this behalf is only limited by the line of demarcation in the twilight zone of the circle of rights and duties. In other words, every man in society has rights which are guaranteed and must be respected. Every right, however, is limited by a duty, and the circle of rights is no broader than the circle of duties. Every man has a right, by his labor, to build or provide a home for himself and family, but he has no right to burn down the house of his neighbor or appropriate it simply because he was too shiftless to provide one of his own.
In Railroad v. Keary, 3 O. S., 202, that able and distinguished jurist, Judge Ranney, said in the syllabus:
“It is a settled maxim of the common law, founded upon the highest obligations of social duty, that every one shall so use his own,, and so prosecute his lawful business, as not, by his negligence or want of care, to injure others.”
And in the opinion, page 206, he says:
“Whatever is not prohibited, may be lawfully done. Whatever a man possesses, that the law recognizes as property, may ■ be used for his benefit, in a lawful manner. What it allows to •one, it allows to all, and secures to all the enjoyment. Hence, in prosecuting his own lawful business, and in the use of his own property, he must submit to the great social necessity of so using his own as not to injure others. While they are his legal right, this is his legal duty. They go hand in hand, and *271 the law scrupulously respects the one, aud rigorously enforces the other. It treats man as a rational and intellectual being, capable of understanding his duties to his fellow-men, and requires of him, in his intercourse with them, to exercise a constant regard for their rights.”
Bishop on Non-Contract Law, Section 10, et seq., says:
“Every person is entitled to live as long as, without feeding on his fellows or otherwise injuring them, he can. This is a self-evident truth. Hence, as no man can live by simply sitting down and breathing, everyone has a right to be constantly active. And as necesarily each one is moved by impulses from his own mind, not anothers, all are permitted to obey, because they must, their several wills.”
Again, in Section 14, he says we have an illustration of universal principles,—
“That, as individuals and their property exist not only separately but also in a combined whole, there is a use legitimate, therefore permissible, for every man’s exertions and estate; but it is unlawful for one to employ either in a way to injure those parts of the combined whole which belong to others. In complications of affairs the applications of this doctrine sometimes become difficult, but the doctrine itself is, if not absolutely, yet practically self-evident.” .
Again, he says, in Section 12:
“Each individual has the natural right to .the fruits of his own labor. Therefore if one has not occasion to use all today when he is well, he may lay up the surplus for tomorrow, when he may be sick.”
This principle we see illustrated in animal life. The squirrel lays in a supply of nuts or grain in the fall of the year to support life during the winter months. Now, suppose one squirrel, stronger and more vicious and savage than dhe others, undertakes to accumulate more than is necessary for his own subsistence, to the detriment of the other squirrels. The other squirrels have a right to resist this encroachment upon their rights, but if they go so far as to kill the greedy squirrel and *272 appropriate all his hoard, then they sink to a lower level of animal savagery. The same is true with respect to men.
A neolithic superman, far in advance of his times, fabricates improved appliances and implements for killing and securing food. In bartering with the members of his tribe or exchanging his improved appliances for game and food, his demands are exorbitant and excessive. The tribe, instead of regulating the barter and exchange, kills the greedy, skillful worker and appropriates all his fabricated implements. These are soon worn out and lost and as there is no other source of supply, the tribe learns too late that it made a fatal mistake.
It is idiotic to destroy property. It is wise to distribute or provide for its distribution to those who created it, in proportion to the efforts, skill, forces and means used in its production.
The doctrine as laid down by the learned and able writers and jurists above quoted is more concretely expressed by Eugene Paignon, who says:
“Society having an object, each one of its members should divest himself of the rights the personal and independent exercise of which would hinder society from attaining this object. He should accept all the duties which society imposes upon him for the attainment of this object, for there would be no society, properly speaking, where there was no controlling poiver to compel co-operation to attain the final object of society.”
The final object of society, as I have said, is to enhance and give value to the individual. This can not be accomplished unless the individual is given the right of security and freedom of will and action, not inconsistent with the rights of others. This fundamental principle may be expressed in the formula: The rights and liberties of one citizen end where the rights and liberties of another begin. Society originated in the conscience, needs and necessities of man; it is based upon right and duty, and man can not destroy it without destroying himself. The moment we permit one man to claim as a right that which is the duty and function of society, we can not limit the grant of right, for whatever one man may lawfully do, so may another, and hence we would soon have as many different proposed remedies *273 for the ills of society as there are different varieties of mind. The result would of course be chaos and anarchy.
The blind Samson may pull down the temple, but if he does he will perish in the ruins. If the iniquities of the Philistines can be controlled by the strong arm of the law, why not use it, and if the arm of the law is not strong or long enough, why not lengthen and strengthen it when this can be easily done ? Why not peace which is constructive, rather than war which is disruptive and destructive?
That capitalists in many instances wax and fatten at the expense of labor is universally true, but the workers out- number the social parasites ten to one and can, by political unification or affiliation with the party that responds to its just demands, secure all the protection guaranteed by the Constitution. Forty-six years ago I advocated suffrage for women in the Ohio Constitutional Convention of 1873, because I believed then, and do now, that woman suffrage will enhance the power of the worker at the ballot box, but I am reluctantly forced to admit that in the ranks of labor are to be found some of the most pronounced opponents of this supreme measure of justice; not only that, but there is under full swing a determined effort by many labor unionists to deprive women of the right to labor. These facts need no comment.
Having in this general way outlined a few of the fundamental principles underlying social conditions, the question before the court will be considered in the light of, and from the viewpoint of these principles which are as eternal as truth and conscience.
What is a strike? The Century Dictionary defines a strike as follows:
“To press a claim or demand by coercive or threatened action of some kind; in common usage, to quit work along with others, in order to compel' an employer to accede to some demand. ’ ’
■ Martin, in “The Modern Law of Labor Unions/’ Section 25, gives many definitions of a'strike, taken from lexicographers and judicial opinions, which he thinks unsatisfactory, 'and: then gives this definition:
*274 “A strike may be defined as a simultaneous cessation of work by workmen acting in combination to compel their common employer to accede to demands made on him by such combination. ’ ’
The following are definitions of a strike:
“To cease from work in order to extort higher wages as workers.” Worcester’s Dictionary.
“The simultaneous eessátion of work on the part of workmen.” Hand, J. in Farrer v. Close, L. R. 4 W. B., 612.
“To cease work in a body by prearrangement until a grievance is redressed.” National Protective Assn. v. Cummings, 170 N. Y., 315.
“The cessation of work by employes in an effort to get better terms of employment.” Iron Moulders Union v. Allis-Chalmers Co., 166 Fed., 45.
These definitions, however, lose sight of the fact that a strike may be declared to resist a demand made by an employer or a condition of employment the employer seeks to enforce. The best definition that has come under my observation is the. following, found in the .Uncyclopedia Britiannica:
“A strike in the labor sense is a stoppage of work by common agreement on the part of a body of workingmen for the purpose of obtaining or resisting a change in the conditions of employment.”
It will be noticed in all these definitions, and in every definition of a strike that can be obtained, that a strike only results where there is the relation of employer and employe; that is, a strike can only be said to exist where there is a trade dispute between the employer and his workmen. This relation is the essential basis of the legal right to maintain and enforce a strike. A strike can not be said to exist where the relation of employer and employes did not exist. Suppose, for instance, a labor union says to a man who employes only non-union labor, “You • discharge your men or compel them to join our union,” and if “he refuses, they proceed to picket his factory, store or place of business and resort to the usual coercive tactics'accompanying such picketing. The action of the union is. not a strike, but' is a- *275 boycott. Neither the union or its members had ■ any trade or other relations with the man, no dispute with him, except a dispute created by themselves. The employer could well say to the union, “I never had any relations with you, I have no dispute with you. Your demand is an impertinence and an invasion of my rights and the rights of my men, who are satisfied with their conditions of employment, which-conditions are fully as good, if not better than, the conditions of employment enjoyed by you.” He might go even farther and say that his men were governed by the merit system, that the most efficient were guaranteed advancement in the ratio of efficiency, while the union men demanded the same wage for the least efficient as well as for the most efficient, and thus destroyed all incentive to and desire for advancement. Under such circumstances, why should this employer be deprived of the right to run and manage his business upon theories he deemed best for himself and his men, and why should the men be unionized against their will ? ■ Did not the right of the union end where the rights of this employer and his men or his workers began ? Argument would be wasted upon men who denied the soundness of this proposition. Conduct of this kind would be license to injure another, rather than the right to better the condition of the one asserting the license. It would be an injury to society itself.
Society is an integer whose unity is menaced by the destruction of its fractional parts. Wrongs must be redressed and eliminated, but only by peaceful and orderly methods. “Silent leges inter arma.” The law is silent during war. When the law is silent no man is safe in person or property. The inculcation of the eternal principles of brotherhood and universal justice alone can prevent war, and peace and progress can only be maintained by the triumph of these principles over greed and wrong. To resist oppression or threatened danger by force is a law of necessity, and can only be evoked under circumstances where the law can not be put in motion in time to prevent the threatened danger. To permit a man to be a law unto himself is a call to anarchy.
Freedom of will not inconsistent with the rights of others is *276 the very foundation of liberty. A man may be in error in exercising his will or choice of conduct. In such case, however, reason and not coercion is the only remedy that justice prescribes. Intelligent persuasion leads and guides the will, while conduct amounting to undue influence and intimidation dominates and enslaves the will. Law springs from conscience, and anything that warps and stifles conscience is destructive of law, order and liberty. The rule of a minority is tyranny, whether the minority be a king and his coterie of nobles, industrial barons who corrupt politics and control legislation for their own benefit, or trade unions who, by coercion, threats and intimidation, prevent those who disagree with them, be those others workers, legislators or judges, from the exercise of their will as conscience, law and judgment dictate, and as experience demonstrates to be for the best interests of society as a whole. The intelligent exercise of the will of man in multitude must control the unrestrained exercise of the will of man in unitude if we would escape anarchistic confusion and social chaos.
The arguments advanced by the parties were clear and comprehensive, the briefs submitted voluminous and exhaustive. The law of the case, however, I am inclined to believe is quite simple, and therefore very few authorities will be cited in the opinion. It is interesting to note that our courts and law writers have closely followed the English doctrine in many respects since 1871. In England since the legislation of 1871-1875, the legality of trade disputes, or strikes as such, has been fully recognized. That is, the cessation or abstention from work by laborers to influence and better employment conditions has been recognized, but the mode and manner of carrying out the strike is subject to certain prescribed conditions. By the Conspiracy and Protection of Property Act of 1875, it was enacted that an agreement or combination by two or more persons to do or to procure to be done, any act in contemplation or furtherance of a trade dispute between employers and workmen, shall not be indictable as a conspiracy if such act, if committed by one person, would not be punishable as a crime. This doctrine, somewhat modified, will be found in many American decisions. 16 Colora *277 do App., 25. Bohn Mfg. Co. v. Hollis, 54 Minn., 223, where it is held that the number of men who unite to do the act can not change the character of the act from lawful to unlawful. This statement must be taken with certain limitations for if the number uniting be numerous, and their acts amount to coercion and intimidation, it may amount to a conspiracy. See State v. Glidden, 55 Conn., 46. By the preponderance of authority, it would seem that where an act would be lawful if done by an individual, it will be lawful if done by a combination, provided they have no unlawful object in view. Doramus v. Hennessey, 176 Ill., 608.
There will be found, as was said by the court in Lindsay v. Montana Federation of Labor, 37 Mont., 264,
“Running through our legal literature many remarkable statements that an act perfectly lawful when done by one person becomes by some sort of legerdemain criminal when done by two or more persons acting in concert, and this upon the theory that the concerted action amounts to a conspiracy. ' But with this doctrine we do not agree. If an individual is clothed with a right when acting alone, he does not lose such right merely by acting with others, each of whom is clothed with the same right. If the act done is lawful, the combination of several persons to commit it does not render it unlawful.”
The italics are ours. So it will be seen that this doctrine depends largely upon motive.
A series of decisions in England, notably Lyons v. Wilkins, L. R. 1 Ch. Div., 811 (1896), construed the Act of 1875 to mean that all picketing was illegal except such as was done for the purpose of obtaining and communicating information. To modify the effect of these decisions, the Act of 1875 was amended in 1906. Section 2 of the latter act provides:
“It shall be lawful for one or more persons acting on their own behalf or on hehalf of a trades union or of an individual employer or firm, in contemplation or furtherance of a trade dispute, to attend at or near a house or place where a person resides or works or carries on business or happens to be, if they so attend merely for the purpose of peacefully obtaining or communicating information or of peacefully persuading any person to work or abstain from work.”
*278 I have underscored the last two lines as containing the gist of modern American decisions upon this question.
Now, note the language found in Cyc., Volume 24, page 834, issued in 1907, a year after the English Act:
“While it has been held that the mere stationing persons near the premises of another for the mere purpose of observing and obtaining information, for the purpose of conveying information to persons seeking or willing to receive the same, or for the purpose of using orderly and peaceful persuasion with those willing to listen, does not in itself constitute intimidation if done in a peaceful manner, the rule has been repeatedly laid down that the keeping of patrols in front of or about the premises of the employer, accompanied by violence or any manner of coercion to prevent others from entering into or remaining in his service, will be enjoined.”
Note again that the language of the text in Cyc. has reference to a strike growing out of a labor dispute where the relation of employer and employes existed before the strike had been called, and if the case now before the court is to be regarded as a strike, the language is significant.
Our attention has been called by counsel for the defendants to the so-called Clayton Act, passed by the Federal Congress and found in United States Compiled Statutes of 1916, being Section 1243d, which provides that no restraining order or injunction shall be granted by any court of the United States, or a judge thereof, in any case—
“between an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment, involving, or growing out of, a dispute concerning terms or conditions of employment, unless necessary to prevent irreparable injury to property.”
This act further provides that,
“No such restraining order or injunction shall prohibit any person or persons, whether singly or in concert, from terminating any relation of employment, * * * or from attending at any place where such person or persons may lawfully be, for the purpose of peacefully obtaining or communicating informa *279 tion, or from peacefully persuading any person to work or to abstain from working; or from ceasing to patronize or employ any party to sucb dispute, or from recommending, advising or persuading others by peaceful or lawful means so to do. ’ ’
There is nothing in this act which contravenes the well considered opinions of Federal courts on the question of picketing in cases theretofore heard and decided by them, but it will be noted that the very language of the English Act of 1906 and of the text in Gyc. is incorporated into this act.
In the instant case, or the case now at bar, it is admitted freer ly and candidly that the purpose is to drive the Peacock Inn restaurant out of business, and of course that would be an' irreparable injury, and would not fall within the provisions of the Clayton Act, even if that act applied.
The picket is not only the eye but the right hand of the strike. No strike of any magnitude can be successfully carried out or prosecuted without picketing. Hence nearly all adjudicated eases on strikes deal with pickets and their activities, conduct and methods, and the doctrine in all eases in relation to this subject is a mere amplification or variation of the doctrine laid down in Cye., as above quoted. It is interesting to note that a close analysis of the English acts, the decisions thereon, the decisions of the Federal and state courts of our country, as well as the language of the so-called Clayton Act, reveal and disclose the pregnant fact that all these decisions, authorities and laws involve trade disputes or controversies growing out of the relation between employer and employees. These acts, the text from Gyc., supra, and the decisions referred to, conclusively demonstrate that a trade dispute arises and can only arise where there is a cessation or stoppage of work if there be an intention on the part of both parties to the dispute to resume the relation of employer and employee upon satisfactory settlement of the dispute or the satisfaction of certain specified conditions prescribed or agreed to by one or both of the parties.
__ It is strenuously insisted, however, by counsel that there does exist a trade dispute between plaintiffs and defendants, for the unions have the right of collective bargaining; that is, they have *280 a right to say to the plaintiffs, “We want to bargain with you and if you refuse, we will boycott you, ’ ’ and thus create a dispute. According to this theory, a hold-up man has a dispute with a victim who refuses to stand and deliver. It is the old story of the wolf and the lamb who came to the stream to drink. The spoiler, hungry, wanted a quarrel and said, “You have made the water muddy for me while I am drinking.” The fleece bearer answered, “Prithee, wolf, how can I do what you complain of? The water is flowing downwards from you to where I am drinking.” The other, disconcerted by the force of truth, exclaimed, “Six months ago you slandered me.” “Indeed,” answered the lamb, “I was not born then.” “By Hercules,” said the wolf, “then ’twas your father slandered me,” and forthwith the lamb was devoured.
Of the 70 or 80 cases cited by counsel in their briefs, not a single one holds it is legal to picket a shop, store or factory with whose proprietor or owner, the men doing or causing the picketing to be done never had any relation as workers or employes. Under such circumstances, that is, under circumstances where picketing is done by a union or its members at or near a store or factory with whom they never had any business or trade relations, it is necessarily done as an aid to a boycott, which is defined by lexicographers and encyclopedists as—
“the refusal and incitement to refusal to have business, commercial or social relations with anyone on whom it is desired or wished to exert or bring pressure. ”
Therefore it must be held that the defendants in the instant case are engaged in a boycott and not in a strike, and if this is true, and it must be true, the defendants are engaged in an act made unlawful by their own constitution. On page 37 of the constitution of the defendants’ international union, by Section 155, it is provided:
“The officers of the international union shall, when called upon to do so, lend every possible effort in aid of members when called out on a strike. ’ ’
*281 It will be here seen that the constitution of this union recognizes the definition of strike as given in this opinion, because it specifically provides that the officers of the international union shall, when called upon to do so, lend every possible effort in aid of members when these members are called out on strike. Under no other circumstances will aid be given, that is, unless members of the union who are working for some hotel or restaurant are “called out on strike.”
By the last paragraph of Section 156 of this constitution it is provided:

“No local union shall under any circumstances be permitted to declare a boycott.”

The things complained of by the plaintiffs or the conduct complained of by the plaintiffs, and engaged in by the defendants is, therefore, a boycott and not a strike, and as the constitution of this union makes it unlawful for a local union under any circumstances to declare a boycott, it follows necessarily that the action of the locals in declaring this boycott is illegal and unlawful.
Cooley, in his work on Torts, adopting the language of the court in Gray v. Building Trades Council, 91 Minn., 171, says, on page 602:
“A boycott may be defined to be a combination of several persons to cause a loss to a third person by.causing others against their will to withdraw from him their beneficial business intercourse through threats that, unless a compliance with their demands be made, the persons forming the combination will cause loss or injury to him.”
In principle, a boycott, abstractly speaking is legally unassailable. In practice, however, it frequently becomes an illegal conspiracy and the tendency is to get outside the strict line of principle and make a boycott an illegal conspiracy to injure the property and rights of the person or persons on whom it _s desired to bring the pressure.
Cooley on Torts, page 603, says:
“As one person may refuse to have business relations with another, so two or more may combine or agree together not to *282 deal with, a particular person for any reason they see fit, and no action will lie, either to prevent the carrying out of this agreement or for damages consequent upon its performance. But if the agreement includes the influencing of parties outside the combination not to deal with the plaintiff, then it is illegal.” Citing Delz v. Winfree, 80 Texas, 400.
In other words, these unions and the men belonging to them have a perfect right not to deal with this Chinese restaurant, but when they place pickets before the restaurant and induce the public generally not to deal with or patronize the restaurant, then the boycott becomes a conspiracy and is assailable.
A case in point is Bohn Mfg. Co. vs Hollis, 54 Minn., 228, where is appears that a large number of retail lumber dealers ■formed a voluntary association not to deal with any manufacturer who should sell lumber directly to consumers not dealers at any point where a member of the association was carrying on a retail yard, and they provided in their by-laws that whenever any wholesale dealer or manufacturer made any such sale, their secretary should notify all the members of the fact. The plaintiff having made such a sale, the secretary threatened to send a Lotice of the fact, as provided in the by-laws, to all the members of the association. This was held not actionable and no ground for an injunction. Here the agreement was by retail lumber dealers simply not to deal with a manufacturer or wholesale dealer wbo sold lumber directly to consumers who were nor dealers at a point where a member of the association was carrying on a retail yard. This they had a right to do; but suppose they went farther and sent circulars to people other than the members of their own association, that is, sent their circulars to all retail lumber dealers, whether they belonged to their association or not, then such act would become a conspiracy under the doctrine laid down by Judge Cooley, and would be enjoined.
Again, a railroad company or other corporation has a right to refuse to employ a man who has left its service or who has been discharged for causes other than those growing out of a trade dispute or as to conditions of employment, and it has the right to notify all its agents or heads of departments in any part of *283 the country not to employ this man, upon the theory that it is a part of every man’s civil rights, as Judge Cooley says:
“that he be left at liberty to refuse business relations with any person whomsoever, whether the refusal rests upon reason, or is the result of whim, caprice, prejudice or malice. With his reasons neither the public nor third persons have any legal concern.” Cooley on Torts, 3rd Ed., 587.
But suppose a railroad or other corporation having thus exercised its right to refuse employment to the man in question, should request other railroads or corporations not to give him employment, then we have a boycott clearly amounting to a conspiracy that is unlawful and therefore actionable.
The boycott, when it becomes a conspiracy, is pernicious, vicious and vindictive, as well as destructive of personal rights, .freedom of action and freedom of will. This, organized labor thoroughly understands, as it has suffered greatly from capitalistic boycotts, so much so that courts and legislatures have been called upon to prevent the activities of employers in this respect., In our own state, Section 12493 General Code, makes it a criminal offense to prevent men from forming or belonging to lawful labor organizations or to discharge men because of their connection with such organizations. The employer’s blacklist has brought untold suffering and misery upon women and children whose husbands and fathers were backlisted.
Labor is property in every sense of the word, and to prevent a man from entering the markets of labor which should be free to all men is an invasion of the most fundamental of all human rights, and this belongs to all men, even Chinese residents of the United States. In this connection, I seriously question the good faith of the defendants. These Chinese they hold are not fit to associate with them in their union, and yet they say they are willing to accept a Chinaman as task-master and boss. It seems most incredible that self-respecting men would be willing to be subject to orders or to accept wages from a man with whom they will not associate socially or otherwise. The attitude of the defendants is inconsistent and their conduct must be re *284 garded and held to be a deliberate attempt to destroy the business of the plaintiffs.
Perhaps the reason is not difficult to find. The public would not patronize a Chinese restaurant in preference to one run by a white man unless the food and service were better and the exactions less. To speak plainly, the public is growing weary of paying exorbitant prices for food and also paying the wages of waiters. The testimony shows that proprietors of hotels and restaurants pay waiters two dollars a day for ten hours work, but that the actual average compensation of waiters is between five and six dollars a day. It was wholly unnecessary to ask who pays the additional three or four dollars. Undoubtedly the public will patronize restaurants where food is good and reasonable and exactions not openly enforced — where tips are accepted as gratuities with thanks and are not expected as a right, which right, if not recognized by the patron, will result in ignoring the patron or giving him bad or indifferent service upon his subsequent return to the restaurant or hotel.
Counsel for defendants insist that the waiters or partners in this Chinese restaurant do not receive the same wages that union men receive, and are required to work longer hours. Indeed it is claimed that the waiters in plaintiff’s restaurant have not been paid any wages since the opening of the place. This is perhaps true, and for the reason that because of the boycott being forced upon this restaurant, it is unable to pay its employees or its partners or make any distribution of assets. Having destroyed the business of the plaintiffs, it comes with bad grace from the defendants to say that the plaintiffs are unable to pay their waiters or make any division of assets among their partners. So far as the hours of labor are concerned, we are not concerned with this question particularly, for the reason that waiters in hotels and restaurants between meals are practically idle, as the transient custom that comes in between meal times is so small that but few waiters are required to wait upon or take care of such customers.
Our attention has been frequently called by counsel for defendants to the case of Moores v. Bricklayers Union, 10 O. D. Reprint, 665, and it is claimed that this case clearly enunciates and *285 lays down the law as found in Ohio today. An examination of the facts in the case shows that the bricklayers union requested Parker Brothers, who were contracting bricklayers, first, to pay á fine imposed upon one of their employees who was a member of the union, and second, to reinstate one apprentice who had left them, and discharge another. This Parker Brothers refused to do. The union then declared a boycott against them and directed the manner in which it should be carried on. This was clearly a trade dispute. In the third part of the syllabi it is said:
“A combination by a trade union and others to coerce an employer to conduct his business with reference to apprentices and the employment of delinquent members of the union, according to the demand of the union, by injuring his business through notices sent to his customers and material men, stating that any dealings with him will be followed by similar measures against such customers and material men, is an unlawful conspiracy.”
I fail to see how counsel can derive any comfort or satisfaction from the law in this ease. In the opinion, however, our attention is expressly called to the obiter of the learned Judge, wherein it is said:
“Every man * * * is entitled * # * to carry on his business, to bestow his labor or to exercise his calling, if within the lato, according to his pleasure. Generally speaking, if, in the exercise of such a right by one, another suffers loss, he has no ground for action. Thus, if two merchants are in the same business in the same place, and the business of the one is injured by the competition, the loss is caused by the other’s pursuing his lawful right to carry on business as seems best to him. In this legitimate clash of common rights, the loss which is suffered is damnum absque injuria. * * *And so it may be said that in these respects, what one workman may do, many may do, and many may combine to do without giving the sufferer any right of action against those who cause his loss.”
. We have already said in this opinion that this is the law, but suppose we carry the illustration still further. If.one of the merchants referred to by the learned Judge finds that his competitor is getting the best of him, has he a right to place pickets *286 in front of his competitor’s door and instruct them to call out to the public passing by that door, “Do not patronize this man, for he is a Catholic,” or “he is a Jew and is unfair to Christians and does not employ Christian labor” or that “he is not a citizen of the United States and therefore should not be patronized by citizens?” Surely under such circumstances counsel for the defendants would not contend that such action was legal or lawful.
It is further contended by counsel for defendants that even if the pickets exceed their authority or do things which the law holds to be illegal and unlawful,
“it is the individual act of a particular picket, who is subject to the discipline of the union, but it is not the act of the union. ’ ’
This is a strange doctrine. It is generally held and is the law that if the servant of one man maliciously injures another while in the scope of his employment or while doing something which may be beneficial to his master, the master will be liable for such malicious acts; and it is further held that if there is any doubt as to whether the servant was acting within the scope of his employment or not, the master will be held liable, upon the theory that he put the servant in motion and is responsible for the acts of the servant because he put him in motion. The union put these pickets in operation and must be held responsible for whatever they do. The'pickets were upon the ground, they had charge of the picketing and were given charge by the union. The case of Nelson Business College v. Lloyd, 60 O. S., 448, is clearly in point. See syllabus and opinion page 453.
If the pickets or any of them performed some act against some individual person because the picket had ill-will or malice against •such person and availed himself of the opportunity and situation to injure him, and his purpose was to injure or annoy such person merely to gratify his spirit of malice or ill-will, then it would be a departure from his employment and the union would not be liable, and .the doctrine of Railroad v. Wetmore, 19 O. S., 110, would apply.
It is further contended that all the things done by the pickets and their conduct in this respect, have been strictly within the law. This we will refer to hereafter.
*287 We call attention now to the doctrine laid down by Gyo. in the text, Volume 24, page 834, that while picketing may be lawful for the purpose of conveying information to persons seeking or willing to receive it, or for the purpose of using orderly and peaceful persuasion to those willing to listen, if done in a peaceful manner, yet "the keeping of patrols in front of or about the premises of an employer, accompanied by violence or any manner of coercion to prevent others from entering into or remaining in the service, will be enjoined.
Coercion involves restraint. It will be idle to say that the conduct of these pickets, as it will be referred to hereafter, has no restraining effect upon patrons of the plaintiff’s restaurant. In law, intimidation is the wrongful use of violence or threats of violence, direct or indirect, against a person with the view of compelling him to do or abstain from doing, some act which he has a legal right to do or abstain from doing.
If a picket practically blocks the door of the restaurant and requests people in a loud voice not to enter therein, timid men and ladies may not care to run the chance of an altercation with the picket, and they are indirectly compelled to refrain from •going therein' or doing what they desire to do, though that may be their wish and purpose.
■ Let us look at this matter squarely and take a rifle shot at it. It is admitted by all parties to this controversy that the Peacock Inn is a respectable restaurant and has been patronized by some of the best people in the city. The mere fact that the defendants claim they are seeking employment as waiters in this restaurant is prima facie evidence that they consider it a reputable and a ■respectable place. The testimony shows that large sums of money, perhaps $40,000, were expended in fitting up and decorating the Peacock Inn and that it presents inside an appearance of almost oriental splendor. Admitting now that it is a place to which any gentleman may take his wife or family, let me ask, is there a ■public official in the city of Cleveland, who depends upon the votes of citizens for continuance in his office, who would take his •family or his friends to this restaurant under present conditions? The city of Cleveland has nearly a million inhabitants. Its mayor should be a man of considerable parts, a man of will, ability and *288 free from fear. Now, let me ask, would the mayor of this city take his family or his friends, under present conditions, to this restaurant to dinner ? If not, why not ?
It would he idle and cowardly to mince words in treating this subject. A candidate for office seen going into this place, a lawyer or a merchant or any professional man seen going into this place, under present conditions, will be subject to a species of indirect intimidation more coercive than the actual employment of physical force. Everybody knows this. There is perhaps hot a Judge upon the bench of the Court of Common Pleas or the Municipal Court who would today patronize this restaurant while this boycott is on or is being prosecuted. "Why? Is it necessary to answer this inquiry?
To constitute intimidation and coercion, physical force is not required. If the will is dominated and overcome by influences which the will can not control, then coercion and intimidation exist.
In the lexicon of the trade union, “peace” is defined to be “war in abeyance — at the will of unseen forces.” A “peaceful picket” is as much a self-evident contradiction as is a rod without two ends. In the language of the street, “there is no sich anamile.”
So far I have been proceeding upon the theory that there is no strike against the Peacock Inn; that the defendants never had any business or trade relations with the proprietors of it; that they never had any men belonging to their union employed by the Inn to be “called out on strike,” as provided in Section 155, page 37, of the union’s constitution; no man was called out on strike. Under their constitution, no aid or benefits can be legally given to these locals by the international union, or governing body; and the General Executive Board, if it would follow the law, would refuse the locals aid or assistance when carrying on this boycott or strike or whatever they may term it, and would refuse to assume jurisdiction over the boycott or to manage or carry it out.
It' is therefore held that no strike or trade dispute exists in ■connection with the plaintiffs; that under the circumstances no *289 strike could exist or be called or declared by the defendants. In( the second place, it is held that by the very language of the constitution of the defendants’ union, a boycott is unlawful, for, as has been said, it is provided in Section 156 that

“No local union shall, under any circumstances, be permitted to declare a boycott.”

The boycott of the local unions is therefore illegal and unlawful according to their own laws and constitution, and the conduct of the defendants and the locals to which they belong is ultra vires, and beyond their powers and beyond the powers conferred upon them by the international union or governing body.
But if we admit, for the sake of the argument, that this boycott is in fact a strike, absurd and ridiculous as such an admission would be, what is the situation then presented? The ease was heard mainly upon affidavits, although some oral testimony was taken. The plaintiffs filed over thirty-one affidavits. These affidavits were made by disinterested respectable' citizens, many of them by ladies of unquestioned honesty. In the first place, the pickets, numbering from three to four in most instances, and in some instances more, are passing out red, white and blue cards, using the colors of our flag, to create bias and prejudice. The men who were doing this seemed to forget that these colors found upon our flag sprung from the Declaration of Independence, which holds that all men are created free and equal, that is, that all men, even including Chinamen residents of the United States, stand equally before the law, that all men have certain inalienable rights, among -\yhich are life, liberty and the pursuit of happiness. Upon this card it is said that the local union has 300 stars in its service flag. This is' not true. The testimony showed that out of 750 members, about 30 of its members were in France. There is no testimony that a single member of these locals ever went over the top or died in defense of the flag. Evidently none of them were volunteers, and all of them were selected men and held off as long as they could, because of the 200 men they say were selected from 750, all but 30 were in camps in the United States. Hence the appeal to patriot *290 ism'is not founded upon fact or justice or right, and is unfair. Affidavits filed by the plaintiffs show that persons in the restaurant could plainly hear the pickets shouting in the street below; that the door of this restaurant, or the door leading to the restaurant, is about three and a half feet wide; that the pickets walked within two or three feet of the front of this door, and rarely, if ever, walked more than a few feet east or west of the door; that they continually shout in a loud voice, “Do not patronize this Chinese restaurant, they belong to the yellow race, they are coolies; they will not employ returning soldiers.” A favorite cry of the pickets to respectable and decent women was, “Hello, sweetheart;” and one gentleman who took his wife to the restaurant said that a picket said to him, “I see you have your’ soubrette with you.” In order to enter the restaurant, patrons have to pass around, jostle and collide with these pickets. Some of the affidavits say that the remarks addressed to them and their ladies were unprintable. Many women in their affidavits swore that the picket said to them, “This is no place for a woman to go,” that the language of 'the pickets was loud and boisterous, and that the pickets menacingly brushed against them. In one of the affidavits it is alleged that one of the pickets said to the affiant that the object of the union was to drive the Chinese out of the town. Most of the affidavits claim that the pickets obstructed the entrance to the restaurant and used insulting language to women. Indeed, one of the pickets who testified for the defendants admitted that he insulted a respectable woman and attempted to give some lame and impotent excuse for his unmanly and cowardly conduct.
The defendants introduced considerable testimony to rebut these affidavits; The pickets invariable, except in one or two instances denied that they used insulting language or made insulting remarks to women or were loud and boisterous in their language. Being interested in the controversy, their testimony will not prevail over that of wholly disinterested witnesses. Quite a number of affidavits of disinterested citizens were introduced on behalf of the defendants, in which they set forth that they had passed by this restaurant at various times and saw nothing wrong, but this testimony is wholly negative. I passed *291 by this place since the boycott was declared and was wholly unaware that there was any trouble or that there were any pickets stationed in front of the restaurant or even that there was a restaurant located at this point, but on Saturday, June 7th, I went by there twice between 12:45 and í :30 p. m. and saw a picket walking directly in front of the door of the restaurant on both occasions, not more than two feet from the door, nor did he go more than two or three feet east of the door or two or three feet west of the door. He was crying in a loud voice, “ Patriotic citizens will not patronize this Chinese restaurant upstairs.' It is unfair to union labor.” No lady, under the situation as I saw it, would undertake to pass by this picket as she would run the risk of colliding with him! The citizens who testified by affidavit or orally that they saw nothing wrong, may have been entirely within the truth, as they may have passed by there at a time when the pickets were not active. None of these citizens, deny, and it is quite probable that they could hot deny, that what the affiants for the plaintiffs state is true.
It is a general rule of evidence, as laid down by Jones on Evidence, Section 898, that
“Affirmative testimony is stronger than negative; in other words, that the testimony of a credible witness, that he saw or heard a particular thing at a particular time and place is more reliable than that of an equally credible witness, who, with the same opportunities, testifies that he did not hear or see the same thing at the same time and place. The reason for this rule is that the witness who testifies to a negative may have forgotten what actually occurred, while it is impossible -to remember what never existed.”
But the fact is that citizens who testified that they saw nothing wrong undoubtedly passed by the place at periods during the day when the pickets were not active, that is, at periods other than at meal times. There is no doubt in the mind of the court, and the court so holds, as a matter of fact, that the evidence clearly discloses that the conduct of the pickets during the times at least that meals are being served in this restaurant, amounts to coercion and intimidation.
*292 The conduct of these men raises a presumption that there is something radically wrong in their theory of unionism. There áre some propositions of unionism so self-evidently true that it is astonishing that they should be forgotten or overlooked by the defendants’ locals. Man can not be elevated and placed so as to remain permanently upon a high social plane by mere physical force alone. If you take a young robin that has not yet fully learned to fly, to the top of Eiffel Tower and throw it off, it will reach the ground, if alive, in a sadly damaged condition. Man and society have been progressing slowly but surely along parallel lines for countless ages. During these ages, civilization has flowed and ebbed but each flow reached a higher mark. The theory was beautifully and admirably expressed by Mr. Cline, of counsel, who compared the progress of civilization to the flight of an eagle, who high in the air, alternately downward glidingly swoops, then upward sweeps and zooms to a higher level. The trouble with this simile is that if the sweep and zoom of the eagle upward is too rapidly continuous, he may get out of sight of the earth and all old familiar landmarks. Then when exhausted, he descends, he may find himself just above a heaving, tumultuous, elemental lashed ocean or a barren waste or arid desert, where everything necessary to sustain life is wanting. In either event, it means death to the adventurous eagle. We all want improvement and progress in social conditions, but the wise, conservative man desires to advance progressively, retaining permanently every' vantage point gained until the ultimate goal is reached, while the radically adventurous man desiring to reach the same goal by leaps and bounds, invariable falls by the wayside, evidence of the fact that social advancement follows natural lines and cannot be forced, for the simple reason that practically all the integers of society must come up together. Hence intellectual progress is indispensible. As man advances, his needs and necessities act as a vis a tergo to effort and activity. Culture and manhood do not depend upon wealth. I have seen millionaires who were instinctively clownish and boorish, while at the same time I have seen men covered with the mud and dirt of the sewer they were engaged in constructing, who could pass a compliment and treat a lady with all the refined courtesy of a courtier of the time *293 “when knighthood was in flower.” When men acquire or innately have the instincts of refined manly manhood, they will demand and receive wages or salary commensurate with the necessities their instincts necessarily create.
Thomas Brassey, an English contractor building a.road in India, advanced the wages of his Hindoo laborers from six to twelve cents a day. The result was that they worked but half time. Six cents a day supplied all the demands of their social condition, and as more was not required, they could not be induced to work more than half time.
Mr. G-unton, a New England writer on political economy, once said that the man who refused to permit his wife and children in the mills eventually earned as much money as the man who did so. That is, the necessity was met and the man arose to the emergency confronting him. Experience demonstrates the truth of this proposition; but where men rely upon others or upon society to care for their needs, they become social crabs and glide or slip backward in the social scale. Hence, while organized effort to obtain better conditions of employment is to be commended, it will fail unless the efforts are primarily based upon the ethical and intellectual development and elevation of the workers. Strong-armed methods end in failure.
For the reasons indicated, the prayer of the petitioners will be granted, and the attorneys for the petitioners may draw a Journal Entry in accordance with this decision.
The defendants are given an exception.